**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| CECILY M. MORGAN, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 15-0401 (RC) |
| | : | | |
| v. | : | Re Document No.: | 8 |
| | : | | |
| WASHINGTON METROPOLITAN | : | | |
| AREA TRANSIT AUTHORITY, | : | | |
| | : | | |
| Defendant. | : | | |

**MEMORANDUM OPINION**

**GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## I.  INTRODUCTION

Plaintiff Ms. Cecily M. Morgan was hired by the Washington Metropolitan Area Transit Authority (WMATA) to manage a grant. After several tumultuous months, she was terminated. Ms. Morgan brought this suit alleging discrimination claims of a hostile work environment (Count 1) and discriminatory termination (Count 2) under Title VII of the Civil Rights Act of 1964. Currently before the Court is WMATA's motion for summary judgment.

For the reasons discussed in this opinion, the Court grants summary judgment to WMATA on Ms. Morgan's hostile work environment claim, and denies WMATA summary judgment on Ms. Morgan's discriminatory termination claim.

## II.  BACKGROUND

At summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his [or her] favor." *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 255 (1986). For purposes of this motion, the Court believes Ms. Morgan's evidence and draws inferences in her favor when the parties disagree.[1]

Plaintiff Cecily Morgan, an African-American woman, Compl. ¶ 4, ECF No. 1, began working at WMATA on June 10, 2013 with the job title "Transit Works Project Manager," Def.'s Statement of Mat. Facts Not in Dispute (Def.'s Mat. Facts) ¶ 1, ECF No. 8-2. Ms. Morgan had received a B.S. from the University of Maryland at College Park and an M.B.A. from the University of Maryland University College, and had previously worked with "a variety of federal contractors and grantees." Compl. ¶ 6. Ms. Morgan was hired after an interview with Linda Stoffregen and Rhoda Beachum. Def.'s Mat. Facts ¶ 3; Morgan Dep. at 22:5–6, ECF No. 8-4.

Ms. Stoffregen, a Caucasian woman, directed WMATA's Operations Management Services division and served as Ms. Morgan's direct supervisor throughout her time at WMATA. Compl. ¶ 7; *see* Def.'s Mat. Facts ¶¶ 2, 4. Ms. Stoffregen supervised five people: Ms. Morgan; Kristen Janes, a Caucasian woman; Rhoda Beachum, an African-American woman; Linda Everest, a Caucasian woman; and Gill Lot, a Caucasian man. Def.'s Mat. Facts ¶ 5. Ms. Beachum retired a few months after Ms. Morgan began working. *See* Beachum Dep. at 5:19–6:10, ECF No. 8-7 (stating that Ms. Beachum's last day at work was July 31, 2013 and her official retirement date was September 1, 2013). Mr. Lott, who is of particular interest in this litigation, was the Training Manager responsible for WMATA's instructors and was a "peer" of Ms. Morgan's. Stoffregen Dep. 104–05, ECF No. 8-5; OPMS Organizational Chart, ECF No. 8-3, Ex. 2.

WMATA provides transit service to the Washington metropolitan area. Compl. ¶ 5. Ms. Morgan's job was to manage a newly received federal grant, the Transit Works Grant. Def.'s Mat. Facts ¶ 1. The granted provided funding for WMATA to train high school students and

---

[1] Disputed facts are noted when included.

veterans for careers in transit. Def'’s Mat. Facts ¶ 7. Ms. Morgan began work with a one-year probationary period. Def.’s Mat. Facts ¶ 6.

Ms. Morgan describes an unpleasant workplace due to rude treatment by Ms. Stoffregen. According to Ms. Morgan, “most of her discussions with me were very sharp in tone, she would never let me finish a statement, she talked over me, she would point at me, she would talk very loudly to me, she would point at the table as she spoke with me, and that was far different than when other senior managers spoke with her.” Morgan Dep. at 38:12–18, ECF No. 11-1. *See also* Morgan Dep. 43:20–21 (describing Ms. Stoffregen as “extremely belligerent and nasty with me”); Morgan Decl. ¶ 29 (describing an incident in which Ms. Stoffregen “continued to scream at me and call me a liar”). Ms. Morgan also claims that Ms. Stoffregen at times publicly ridiculed her for perceived work failures, and once scheduled a meeting but then did not attend. Morgan Decl. ¶¶ 16, 23. Ms. Morgan asserts that this behavior was a form of discrimination based on race. Compl. ¶ 13. Ms. Morgan does not assert that she experienced any “racially insensitive comments, language, jokes, or slurs.” Def.’s Mat. Facts ¶ 41.

### A.  Ms. Morgan’s Responsibilities

Although both parties agree that Ms. Morgan was hired to manage the Transit Works Grant, they differ significantly on the precise contours of that position. In particular, WMATA characterizes Ms. Morgan’s role as one with a great deal of responsibility and autonomy, while Ms. Morgan emphasizes that Ms. Stoffregen held ultimate authority, and, in fact, reversed several of her decisions.

The Transit Works Grant provided $795,000[2] for WMATA to use in training high school

students and veterans for careers in transit. Def.'s Mat. Facts ¶ 7. Two high schools and one

veterans organization, the VETS Group,[3] participated. Def.'s Mat. Facts ¶ 8. One of Ms.

Morgan's key tasks was completing the Memoranda of Understanding (MOUs) with each partner

organization. Def.'s Mat. Facts ¶ 9. The MOUs describe the relationship between WMATA and

its partners, including the budget, schedule, and various responsibilities of the organizations.

VETS Group MOU, ECF No. 11-10. WMATA spent money directly under the grant, including

hiring instructors and at least a portion of Ms. Morgan's salary. *See, e.g.*, Transit Works Program

Budget, ECF No. 8-3, Ex. 5 (showing that WMATA would seek reimbursement under the grant

for a total of $214,400 in technical instructors' salary and $100,000 of the project manager's

salary); Transit Work Grant Budget, ECF No. 8-3, Ex. 6 (same); Compl. ¶ 7 (stating that Ms.

Morgan's salary as a project manager was $125,000). Each of the partner groups also made

expenditures under the grant, such as providing transit stipends and time-in-class stipends to

participants. *See, e.g.*, Transit Works Program Budget, ECF No. 8-3, Ex. 5; Transit Work Grant

Budget, ECF No. 8-3, Ex. 6. The partner groups paid these expenses out-of-pocket, and then

submitted invoices to WMATA for reimbursement. *See* Email from Joe Wynn to Linda

Stoffregen (Dec. 12, 2013), ECF No. 8-3, Ex. 11. WMATA was to reimburse the partner

organizations after it had validated the invoices, and then WMATA itself would submit for

reimbursement from the Federal Transit Administration. *See* Stoffregen Dep. at 18:4–19:9. Thus,

both the partner organizations and WMATA risked losing their own money if reimbursement

---

[2] The amount of the grant appears to be $795,000, although Defendant has at time cited other figures. *Compare* Def.'s Mat. Facts ¶ 9 ("$795 million"), *with, e.g.,* Termination Mem., ECF No. 8-3, Ex. 1 ("795K Transit Works Grant").

[3] Although the parties style this in various ways, the Court will use "VETS Group," as the MOU does. *See* VETS Group MOU, ECF No. 11-10.

was denied. Helping the partner organizations track their expenditures and get their invoices approved, as well as ensuring that WMATA's records would enable its ultimate reimbursement, was another of Ms. Morgan's key tasks. Def.'s Mat. Facts ¶ 9.

According to WMATA, Ms. Morgan was "a 'team of one' responsible for management of all aspects" of the grant, including the MOUs, invoices, and associated documentation. Def.'s Mat. Facts ¶ 9; *see also* Stoffregen Dep. at 17–19, ECF No. 8-5. Ms. Morgan agrees that "it was [her] job to prepare and get approval of Memoranda of Understanding (MOUs) between WMATA and its grant partners and then to see that training called for under the grant was provided and that WMATA's partners were compensated." Pl.'s Mem. Opp'n Def.'s Mot. Summ. J. at 1, ECF No. 11. Ms. Morgan disputes the characterization of her role as a "team of one," since she asserts that Ms. Stoffregen "insisted on being the final authority on all decisions" and "indiscriminately interfered when [Ms. Morgan] attempted to resolve any matter." Morgan Decl. ¶ 10, ECF No. 11-1. Ms. Morgan's examples of this interference include Ms. Stoffregen's inconsistent decisions about whether students who left within the first weeks could be replaced, Morgan Decl. ¶ 26, and Ms. Stoffregen's several, contradictory decisions about whether parking passes or travel reimbursements would be provided to veterans who drove to the training site, Morgan Decl. ¶ 25.[4]

The parties agree that Ms. Morgan "was *not* responsible for the [grant's] curriculum or hiring of instructors." Def.'s Mat. Facts ¶ 11 (emphasis added). WMATA asserts that Mr. Lott, another of Ms. Stoffregen's direct reports, "hired and managed the instructors" but had no other management role in the grant. Def.'s Mat. Facts ¶ 12. Ms. Morgan disagrees with the last point,

---

[4] Ms. Stoffregen denies several of these claims, but the Court accepts Ms. Morgan's facts at summary judgment. *See, e.g.*, Stoffregen Dep. at 72:16–22 (stating that she never changed her mind on the travel reimbursements).

citing meetings that Mr. Lott attended which covered issues including travel reimbursements, parking passes, invoices, and the substitution of students. Pl.'s Statement Genuine Issues (Pl.'s Mat. Facts) at 3, ECF No. 11-20; *see also* Morgan Decl. ¶¶ 25–26.

Ms. Morgan further asserts that she was not informed of all of her supposed responsibilities because she never "received a position description" or "participate[d] in a written goal setting." Compl. ¶ 9. WMATA does not disagree, but points to a written position description "available in WMATA's Human Resources' Department and on WMATA's internal intranet server [that] could be accessed by any WMATA employee." Def.'s Mat. Facts ¶ 10*; see also* Job Description, ECF No. 8-3, Ex. 3 (describing the responsibilities of a Project Manager, TA-25). Ms. Morgan disputes that this job description applied to *her* job, calling it "transparently false" due to a variety of inaccuracies. Pl.'s Statement of Genuine Issues (Pl.'s Mat. Facts) at 2–3. For example, the manager of the description "carr[ies] out the Authority's construction program" (no construction was involved in managing the grant) and, unlike Ms. Morgan, is a Professional Engineer with "a minimum of seven (7) years demonstrated successful experience in overall technical management with a large engineering and construction project." *See* Pl.'s Mat. Facts at 2–3; Job Description; Def.'s Mat. Facts ¶ 9. Nor does the job description describe the responsibilities on which WMATA and Ms. Morgan agree—such as executing the MOUs or supervising the invoicing process. Job Description. Ms. Morgan explains that she requested a position description and regular meetings with Ms. Stoffregen, but Ms. Stoffregen said the initial interview had conveyed the responsibilities and refused to meet. Morgan Dep. 25:13–22, ECF No. 8-4.

### B.  WMATA's Reasons for Terminating Ms. Morgan

Ms. Morgan was terminated December 17, 2013, still within her probationary year.[5]

Def.'s Mat. Facts ¶ 17. Ms. Morgan asserts that she was fired as a form of discrimination based

on race. Compl. ¶ 15.[6] WMATA avers that the termination was performance based. WMATA's

Termination Memorandum, signed by Ms. Stoffregen and shown to Ms. Morgan when she was

discharged, states that "issues have continued to occur during the last few months that

demonstrate your inability to perform the primary duties of [the] position" and that "overall

productivity has been unsatisfactory." Termination Mem., ECF No. 8-3, Ex. 1. The

memorandum lists one textual example and five bullet points, for a total of six areas of poor

performance. The six areas are:

> [1] [A]llow[ing] the VETs Group to start training at WMATA's [] [f]acility on
>      September 3, 2013 without a signed MOU. . . .
> [2] Failure to convey [a school's] decision on their previous [i]nstructor.
> [3] Failure to effectively manage the grant and achieve results.
> [4] Failure to provide guidance to the grant partners on submission of invoices
>      and required documentation.
> [5] Failure to review and verify submitted invoices.
> [6] Failure to demonstrate budgetary understanding and proficiency.

Termination Mem.

---

[5] After Ms. Morgan's termination, Ms. Stoffregen asserts that she took over Ms. Morgan's duties. Stoffregen Dep. at 19:13–17. WMATA nowhere argues that Ms. Morgan was discharged for redundancy. *Cf. George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005) ("[T]he elimination of the plaintiff's position altogether" is considered one of the "common legitimate reasons for discharge.").

[6] In support of this contention, Ms. Morgan describes Ms. Beachum's statement that Ms. Stoffregen would terminate Ms. Morgan in retaliation for claiming discrimination and that "other African American employees who worked under other managers under Linda told me that." Morgan Dep. at 41:15–18. Ms. Morgan does not identify any such statements by Ms. Beachum or other employees in the record.

The Court reviews each of these areas in turn, combining (4) and (5) because WMATA does not differentiate among its invoice-related claims.

    1.  Allowing Training to Begin Prior to Completion of the MOUs

WMATA's first stated reason for terminating Ms. Morgan is that she "allowed the VETs Group to start training at WMATA's [] [f]acility on September 3, 2013 without a signed MOU." Termination Mem., ECF No. 8-3, Ex. 1. Both parties agree that the VETS Group did in fact begin training on September 3, 2013. Def.'s Mat. Facts ¶ 12; Pl.'s Mat. Facts at 5. The MOU was executed on September 19, 2013.[7] VETS Group MOU at 13, ECF No. 11-10. The parties' accounts differ as to the surrounding circumstances. According to WMATA, Ms. Stoffregen "discovered" the issue on September 3. Termination Mem. This language of "discovery" suggests that Ms. Stoffregen was previously unaware that training started without an MOU. Ms. Morgan disputes this assertion, claiming that she warned Ms. Stoffregen in mid-August that the MOU was delayed and might not be completed before the date set for starting training. Morgan Decl. ¶ 16. According to Ms. Morgan, Ms. Stoffregen was actually involved in trying to fix the delays in the legal department by emailing them to "HELP." Morgan Decl. ¶ 16. Furthermore, Ms. Morgan argues that it was *Ms. Stoffregen* who "allowed" the VETS Group to start without the MOU, because Ms. Stoffregen replied to the warning about the MOU that "the start date was not to be altered under any circumstances."[8] Morgan Decl.

---

[7] The MOU itself shows that it was signed by the VETS Group on September 3, 2013, and by WMATA on September 19, 2013. VETS Group MOU at 13. According to Ms. Morgan, the VETS Group actually signed September 6, 2013, but backdated the document to September 3 at Ms. Stoffregen's request. Morgan Decl. ¶ 18.

[8] WMATA appears to limit its objections to the fact that the training began without the MOU, rather than the total length of time that the MOUs were in progress. As Ms. Stoffregen stated, "[the termination] had nothing to do about the duration of how long it took [sic] the

¶ 16. Finally, Ms. Morgan argues that she had no set deadline to complete the MOUs. *See Morgan Dep.* at 51:7–9 ("Q. Did Linda give you any timetable or timeline as to when those MOUs should have been completed? A. No."); *but see* Stoffregen Dep. at 42:20–43:4, ECF No. 11-2 (claiming that she had articulated that "it was critical they were signed before training started" on "[t]he first or second day of [Ms. Morgan's] employ").

> 2.   Not Personally Notifying Ms. Stoffregen of Problems with an Instructor

WMATA's second stated reason for terminating Ms. Morgan is that she "[f]ail[ed] to convey [a school's] decision on their previous [i]nstructor." Termination Mem., ECF No. 8-3, Ex. 1. Although this reference is somewhat opaque, the parties appear to agree on the relevant event. On September 26, 2013, Ms. Morgan and Mr. Lott learned that one of the instructors hired by the grant program would not be accepted by one of the high schools because the instructor had left his previous job at the school under unharmonious circumstances. Def.'s Mat. Facts ¶ 22. That instructor had been hired by Mr. Lott.[9] Stoffregen Dep. 99:20; Lott Dep. at 14–15, ECF No. 11-3. After this discovery, Mr. Lott repeatedly assured Ms. Morgan that *he* would discuss the issue with Ms. Stoffregen. *See* Lott Dep. 66:13 ("I told Cecily [Morgan] that I would tell Linda [Stoffregen].."); *see also* Morgan Decl. ¶ 28. Ms. Morgan claims that she immediately attempted to contact Ms. Stoffregen by phone, but "she didn't return my call, nor did she answer the phone." Morgan Dep. 74:12–14. Ms. Morgan also stated that she asked the school principal to "submit a memo to Linda Stoffregen in writing" explaining the issue, but he did not. Morgan

---

MOUs. It was about the fact that the training was allowed to commence prior to the MOU being signed." Stoffregen Dep. 42:13–16.

[9] According to Ms. Morgan, Ms. Stoffregen may also have been involved in hiring the instructor. *See* Morgan Decl. ¶ 27 ("Ms. Stoffregen explicitly told me on several occasions that she and Gill Lott . . . would hire the instructors"). Ms. Stoffregen denies any involvement. Stoffregen Dep. at 23:17–20.

Decl. ¶ 30(2). After these attempts, Ms. Morgan stated that she left the next day for a scheduled

work conference in Chicago. Morgan Decl. ¶ 28. When she returned the next week, it was to an

irate Ms. Stoffregen, who called her screaming to blame her for not personally communicating

the news and said she was a "liar." Morgan Decl. ¶ 29.

Ms. Stoffregen does not dispute that Mr. Lott promised to inform her. *See* Stoffregen

Dep. at 97:16–18 (agreeing that "Gill Lott had told Ms. Morgan to not—that he would be the one

to tell me"). However, she stated that "[she] blame[d] Ms. Morgan" because "Ms. Morgan was

responsible for the Transit Work Grant" while "Mr. Lott was managing the instructors. He had

nothing to do with the Transit Work Grant management." Stoffregen Dep. at 105:4–19. Ms.

Morgan objects to this reasoning, arguing that it would be unreasonable for Ms. Stoffregen to

blame her for a problem related to instructor hiring, when Mr. Lott, and not Ms. Morgan, was

explicitly responsible for hiring all instructors. Pl.'s Mat. Facts at 6. Despite Mr. Lott's role in

the problem, Ms. Stoffergen did not discipline or yell at him. Pl.'s Mat. Facts at 8.[10]

### 3. Failure to Effectively Manage the Grant and Achieve Results

WMATA's third stated reason for terminating Ms. Morgan is that she "[f]ail[ed] to

effectively manage the grant and achieve results." Termination Mem., ECF No. 8-3, Ex. 1.

WMATA's briefing does not give this vague statement any additional context, such as by

describing specific grant "management" tasks at which Ms. Morgan was deficient, or

enumerating "results" that Ms. Morgan failed to achieve. In the absence of guidance from the

---

[10] Ms. Stoffregen stated that she was "upset" with Mr. Lott, but that she did not
"discipline" him. Stoffregen Dep. 107:2–4, 108:7–13. Although Ms. Stoffregen first stated that
she "encouraged" Mr. Lott to retire shortly thereafter, she later stated that she asked him to stay
on to "fill in" a gap in instruction. Stoffregen Dep. 107–108. According to Mr. Lott, he was
never encouraged to retire and, in fact, was encouraged to stay. Lott Dep. 66:8–9.

parties, the Court will glean what it can from WMATA's miscellaneous complaints about Ms. Morgan's overall performance.

First, WMATA suggests that Ms. Morgan required assistance or prompting from Ms. Stoffregen to complete tasks that she should have been able to complete independently. For example, WMATA mentions a specific email "providing guidance to Plaintiff concerning her workload and schedule." Def.'s Mat. Facts ¶ 26; Email from Linda Stoffregen to Cecily Morgan (July 22, 2013), ECF No. 8-3, Ex. 4. Ms. Morgan disputes that the email shows she was not performing well, stating that "nothing in the July 22, 2013 email [] suggests that Ms. Morgan was not on top of the project. There is no evidence that the tasks and deliverables described in the email were not delivered or accomplished in a timely manner." Pl.'s Mat. Facts at 16. The email itself reads, "[t]o ensure that we move forward in the most effective and efficient manner we need to follow a planned schedule . . . . Following that logic, I need you to report to JGB tomorrow morning to accomplish the following" and then lists several tasks. Email from Linda Stoffregen to Cecily Morgan (July 22, 2013), ECF No. 8-3, Ex. 4. The email continues by following up on some past actions, "[p]er your email last Thursday you were going to call [participant group] Friday morning . . . . Have you spoken to [them]?" Email from Linda Stoffregen to Cecily Morgan (July 22, 2013). Finally, the email says, "we have been talking about multiple deliverables can you please complete and provide the following for my review by Friday 7/26/2013" and then lists several more tasks. Email from Linda Stoffregen to Cecily Morgan (July 22, 2013).

Ms. Morgan also points to general statements of praise from Ms. Stoffregen. Ms. Stoffregen referred to completing the MOUs as the "hardest part" of Ms. Morgan's job. Email from Linda Stoffregen to Cecily Morgan and Sonia Bacchus (Sept. 19, 2013), ECF No. 11-9.

After Ms. Morgan completed the MOUs, Ms. Stoffregen emailed her "I know you will do well

managing this program based on the outstanding job you did with the constant monitoring and

management of the MOUs." Email from Linda Stoffregen to Cecily Morgan and Sonia Bacchus

(Sept. 19, 2013). Ms. Morgan also points to statements by Mr. Lott that Ms. Morgan was

organized and effective. *See* Lott Dep. at 19:13–20:9, ECF No. 11-3 (noting that Ms. Morgan

"came in running" and Mr. Lott did not have "any difficulty in working with her").

4.   and 5.   Lack of Guidance and Problems Reviewing Invoices

WMATA's fourth and fifth stated reasons for terminating Ms. Morgan were that she

"[f]ail[ed] to provide guidance to the grant partners on submission of invoices and required

documentation" and "[f]ail[ed] to review and verify submitted invoices." Termination Mem.,

ECF No. 8-3, Ex. 1. These invoices, as described above, were important to the finances of both

WMATA and the partner organizations, as they determined both groups' ability to be reimbursed

for money each had already spent. Both parties focus their briefing on the VETS Group invoice

process, which was apparently unusually challenging.

WMATA's briefing does not elaborate on how Ms. Morgan's "guidance" to any of the

partner groups was lacking. Ms. Morgan asserts that she provided significant amounts of help to

the VETS Group, and that they "received extensive guidance verbally during our bi-weekly

conference calls, in writing via email with instructions and attachments, and in person as I spent

a great deal of time assisting them in developing their grant voucher and invoicing templates,

reviewed and questioned their submissions, and attempted to discuss their invoicing issues with

them." Morgan Decl. ¶ 30(4). Ms. Morgan cites numerous examples of problems that she

identified and corrected with the group, including billing for the wrong amount of insurance.

Morgan Decl. ¶ 21. Ms. Morgan avers that *she* sought guidance from *Ms. Stoffregen* about the

timeline for reimbursing the group, but when she arrived for their scheduled meeting "Ms. Stoffregen's door was closed and locked." Morgan Decl. ¶ 23. The VETS Group also confirmed by email that they received guidance from Ms. Stoffregen. *See* Email from Joe Wynn to Linda Stoffregen (Dec. 12, 2013), ECF No. 8-3, Ex. 11 ("We have even sat down with your Program Manager and went over item by item and document by document in order that we were submitting what we were told that you required in order for your accounting department to process our requests for reimbursement. However, after several months of program operations, and thousands of dollars of disbursements by the VETS Group, we are now being told that our documentation is still not sufficient.").

Despite any guidance that was provided, the VETS Group did not receive reimbursement on their invoices for several months. Def.'s Mat. Facts ¶¶ 32–33. Both parties agree that the VETS Group began training in September, submitted their first invoices in early October, and had not had their invoices completely processed by early December, *see* Morgan Decl. ¶¶ 22–23, 30(4); Def.'s Mat. Facts ¶¶ 32–33, but they disagree as to the reasons for that prolongation.

According to WMATA, this was an unacceptable delay due to Ms. Morgan's delay and incompetence. *See* Def.'s Mat. Facts ¶¶ 32–33. Ms. Stoffregen gave Ms. Morgan a deadline of December 2 to submit the invoices, and according to WMATA, was unhappy with the result. Def.'s Mat. Facts ¶¶ 33–34. Ms. Morgan claims that she "missed no deadlines" and that the invoices were received October 11, 2013, and sent to Ms. Stoffregen on December 4, 2013, within the 60 day deadline set by the MOU. Pl.'s Mat. Facts at 18. Indeed, WMATA does not identify any support in the record for any missed deadlines by Ms. Morgan. *See* Stoffregen Dep. 60–70; *see also* Stoffregen Dep. 120:21–121:3 ("I got the invoices finally on December the 2nd . . . . I had given her a deadline finally.").

WMATA identified several flaws with the invoices as they were received by Ms. Stoffregen on December 2. First, Ms. Morgan had created a more complicated time sheet for reporting attendance instead of using only the initial attendance rosters with students' and instructors' signatures. Stoffregen Dep. 65–67. According to Ms. Stoffregen, only the basic roster was needed, and any transfer of the initial data risked introducing errors. Stoffregen Dep. 65–67. Ms. Morgan disputes this, arguing that "[t]ime sheets [instead of rosters] were necessary because the stipend . . . was reduced when [participants] did not attend the full training session." Pl.'s Mat. Facts at 20–21. In support, Ms. Morgan points to an email she sent identifying a $65 overpayment based on the more detailed time sheets. Pl.'s Mat. Facts at 12; *see also* Email from Cecily Morgan to Linda Stoffregen (Dec. 4, 2013), ECF No. 8-3, Ex. 8.

Second, WMATA further claims that some of the payment vouchers showed inconsistencies, and provides as an example that the same check number was shown being used to pay two different people. *See* Def.'s Mat. Facts ¶ 39 ("Plaintiff, as project manager, should have discovered that payment vouchers were incorrect with duplicate check numbers to different people."); *see also* Stoffregen Dep. 64:12–22 ("I was very dismayed by what I found . . . . And they had paid—they had put check numbers on things. They had paid the same person with the same check number, two different people."). Ms. Morgan responds that she had already identified the apparently "duplicate check numbers" and learned from the VETS Group that the payments were "written from two different checkbooks." Morgan Decl. ¶ 20.

Third, WMATA identifies Ms. Stoffregen's concerns that "signed rosters were not included in Plaintiff's initial verification package . . . nor was there any indication that Plaintiff cross-referenced who was training with the invoices submitted." Def.'s Mat. Facts ¶ 37; *see also* Stoffregen Dep. 64:12–22 ("I was very dismayed by what I found. There was—the invoices

didn't match the rosters."). One of the emails in question reads, in relevant part, "Did you cross

reference who was in training with the invoices that were submitted?" Email from Linda

Stoffregen to Cecily Morgan (Dec. 4, 2013, 12:57 PM), ECF No. 8-3, Ex. 7. Another reads "I

need copies of the signed rosters to confirm these individuals were in class. It needs to be part of

the package that goes with the invoice." Email from Linda Stoffregen to Cecily Morgan (Dec. 4,

2013, 11:40 AM), ECF No. 8-3, Ex. 7. Ms. Morgan asserts that she had cross-referenced the

payments with the student records. Pl.'s Mat. Facts at 12; *see also* Email from Cecily Morgan to

Linda Stoffregen (Dec. 4, 2013), ECF No. 8-3, Ex. 8.

Finally, WMATA identifies as problematic that Ms. Morgan "allowed document payment

vouchers in Microsoft WORD format rather than canceled checks or actual proof that payments

. . . were actually made." Def.'s Mat. Facts ¶ 38; *see also* Stoffregen Dep. 64:12–22 ("I was very

dismayed by what I found . . . . And . . . that they had made these payments to people, they had

made Word documents."). The related email reads "Where is the supporting backup documentation

for the payment vouchers submitted by the Vets Group. Having a one page document submitted

stating the amount and in some cases a check number is not validation." Email from Linda

Stoffregen to Cecily Morgan (Dec. 4, 2013, 1:00 PM), ECF No. 8-3, Ex. 9. In response, Ms.

Morgan asserts that she did review the canceled checks "immediately" upon receiving them on

October 11, 2011 in order to validate the payment vouchers. Morgan Decl. ¶ 20.

In WMATA's view, the frustrations of the invoice process led to the VETS Group

"sen[ding] an e-mail to Ms. Stoffregen expressing the group's displeasure with Plaintiff." Def.'s

Mat. Facts ¶ 40; *see also* Stoffregen Dep. at 69:19–21 (characterizing the complaints in the email

as "[the author] was aggravated the biggest because he hadn't got paid [sic]"). Ms. Morgan, in

contrast, characterizes the email as expressing frustrations primarily on other issues, many of

which were caused by Ms. Stoffregen's "arbitrary decisions and reversal of previous understandings." Pl.'s Mat. Facts at 9; *see also* Morgan Decl. ¶ 25 (describing Ms. Stoffregen's inconsistent decisions on the use of parking passes by the group). The email itself could support both parties' assertions. The email first devotes four paragraphs to the parking issue, and expresses frustration with the reversals during the process. Email from Joe Wynn to Linda Stoffregen (Dec. 12, 2013), ECF No. 8-3, Ex. 11. The email then devotes three paragraphs to the issues with invoicing, and complains that they "[had] yet to receive any reimbursement from WMATA." Email from Joe Wynn to Linda Stoffregen (Dec. 12, 2013). The email also identifies as a problem that they had "been told several different things" regarding drug testing, that they "were told that [Ms. Stoffregen] [was] not available or had no need to meet with us" when they requested meetings, and the general "inefficient" management of the program. Email from Joe Wynn to Linda Stoffregen (Dec. 12, 2013).

### 5.  Lack of Proficiency in Budgeting

WMATA's sixth and final stated reason for terminating Ms. Morgan is that she "[f]ail[ed] to demonstrate budgetary understanding and proficiency." Termination Mem., ECF No. 8-3, Ex. 1. These concerns appear to focus around the overall budget for the grant, which was memorialized in several Excel documents. Ms. Morgan initially created an Excel document to track the budget. *See* Budget, ECF No. 8-3, Ex. 5. On October 9, 2013, Ms. Stoffregen and Ms. Morgan met and Ms. Stoffregen saw Ms. Morgan's document. Meeting, ECF No. 8-3, Ex. 5. Later that day, Ms. Stoffregen emailed Ms. Morgan a different budget in Excel that she had created, with the email text "Attached is the transit works budget broken out." Email from Linda Stoffregen to Cecily Morgan (Oct. 9, 2013), ECF No. 8-3, Ex. 6.

According to WMATA, Ms. Stoffregen "expressed concerns" about Ms. Morgan's budget during the meeting and "believed that the document provided by Plaintiff at the meeting showed a lack of budget expertise required of the position." Def.'s Mat. Facts ¶ 27. For support, WMATA cites to a note written by hand, presumably by Ms. Stoffregen, on the printed meeting notification. Meeting, ECF No. 8-3, Ex. 5. No date for the handwritten note was provided. The note reads:

> I had to explain how to lay out the budget in alignment with the proposal. She clearly had not been involved in grants budgets as stated in this meeting & @ her interview. I challenged her on it and she became very defensive stating she had millions of dollars of experience.

Meeting.

Ms. Morgan disagrees with this characterization. Because her version had been used for several months previously, she argues that Ms. Stoffregen had approved it. Morgan Decl. ¶ 19. Ms. Morgan also argues that Ms. Stoffregen had no reason to prefer her own version, because she did not identify any differences between the budgets and said only that she "did not 'like'" Ms. Morgan's, Morgan Decl. ¶ 19, and "[y]ou can use that, but here's what I'm going to use," Morgan Dep. 81:9–16, ECF No. 8-4. Furthermore, Ms. Morgan argues both that setting out the budget was not "something that [she] needed to do" because Ms. Stoffregen took responsibility for it, Morgan Dep. at 78–81, and that Excel was only being used because Ms. Stoffregen refused to allow Ms. Morgan access to WMATA's PeopleSoft system, which would have been preferable, Morgan Decl. ¶ 19. Although the two documents are in the record, Transit Works Program Budget, ECF No. 8-3, Ex. 5 (Ms. Morgan's version); Transit Work Grant Budget, ECF No. 8-3, Ex. 6 (Ms. Stoffregen's version), neither party provides any analysis of the differences between the budgets and the Court does not attempt one.

### C.  Procedural History

Ms. Morgan filed her complaint under Title VII on March 19, 2015. Compl. ¶ 1. Her

complaint states two causes of action—one for a hostile work environment based on race, and

one for discriminatory termination based on race. Compl. ¶¶ 13–14, 15–16. WMATA moved for

summary judgment on both claims on April 15, 2016. Def.'s Mot. Summ. J., ECF No. 8. Ms. Morgan

filed a memorandum opposing summary judgment on May 31, 2016, Pl.'s Mem. Opp'n. Def.'s

Mot. Summ. J., ECF No. 11, and WMATA filed its reply on June 14, 2016, Def.'s Reply to Pl.'s

Opp'n to Def.'s Mot Summ. J., ECF No. 13. The matter is thus ripe for decision by the Court.

### III.  LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). A "material" fact is one capable of affecting the substantive outcome of the

litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if

there is enough evidence for a reasonable jury to return a verdict for the nonmovant. *Scott v.*

*Harris*, 550 U.S. 372, 380 (2007). The burden is on the nonmovant who must point to specific

facts in the record that reveal a genuine issue that is suitable for trial. *Celotex Corp. v. Catrett*,

477 U.S. 317, 324 (1986).

When considering a motion for summary judgment, the Court analyzes all underlying

facts and inferences in the light most favorable to the nonmovant, *Anderson*, 477 U.S. at 255,

and "eschew[s] making credibility determinations or weighing the evidence," *Czekalski v.*

*Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007). Nonetheless, the nonmovant may not offer only

conclusory assertions without evidentiary support. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C.

Cir. 1999). Indeed, "conclusory allegations" and "unsubstantiated speculation," whether in the

form of a plaintiff's own testimony or other evidence submitted by a plaintiff to oppose a summary judgment motion, "do not create genuine issues of material fact." *Bonieskie v. Mukasey*, 540 F. Supp. 2d 190, 195, 200 n.12 (D.D.C. 2008) (citations omitted).

"While a nonmovant is not required to produce evidence in a *form* that would be admissible at trial, the evidence still must be capable of being converted into admissible evidence." *Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000) (citing Fed. R. Civ. P 56(e)). Thus, inadmissible hearsay cannot be used to either support or refute a motion for summary judgment. *See id.* (rejecting portions of a nonmovant's deposition that contain hearsay). In the employment discrimination context, where this circuit has noted that "employers rarely maintain records directly evidencing discrimination, an added measure of rigor, or caution, is appropriate in applying this standard to motions for summary judgment." *Woodruff v. Peters*, 482 F.3d 521, 526 (D.C. Cir. 2007) (internal quotation marks and citations omitted).

## IV.  ANALYSIS

Under Title VII, employers may not "discharge," or "otherwise . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment" because of the individual's "race[,] . . . sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). In her complaint, Ms. Morgan claims both a hostile work environment and discriminatory termination based on her race. Each claim is addressed in turn.

### A.  Hostile work environment

WMATA argues that it is entitled to summary judgment on Ms. Morgan's hostile work environment claim because the treatment Ms. Morgan describes was not sufficiently severe or pervasive. WMATA further argues that Ms. Morgan has waived her hostile work environment

claim by failing to respond to its arguments in her opposition. The Court agrees with WMATA that Ms. Morgan's claims of mistreatment are not severe or pervasive enough to give rise to a hostile work environment claim, and therefore dismisses the claim.

A successful claim for a hostile work environment requires showing that (1) the plaintiff is a member of a protected class and, (2) was subjected to unwelcome harassment, (3) because of her race, and (4) that harassment affected a term, condition, or privilege of her employment. *Nurriddin v. Goldin*, 382 F. Supp. 2d 79, 107 (D.D.C. 2005). In assessing whether the harassment affected a term, condition, or privilege of employment the Court considers whether the harassment was so "severe or pervasive" as to "alter the conditions of [the plaintiff's] employment and create an abusive working environment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998) (internal quotation marks and citation omitted). The harassment must be both objectively and subjectively hostile in light of the totality of the circumstances. *Id.* at 787. The totality of the circumstances includes "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). Based on this analysis, even frequent mistreatment—such as offensive utterances—does not rise to the level of a hostile work environment if it is not sufficiently severe. For example, many cases in this jurisdiction show "that simply having a rude, harsh, or unfair boss is not enough for a hostile work environment claim." *Dudley v. WMATA*, 924 F. Supp. 2d 141, 171 (D.D.C. 2013). Ms. Morgan fails to meet this demanding standard.

As an initial matter, WMATA argues that this court should treat the argument as conceded and grant it summary judgment because Ms. Morgan's opposition did not defend the hostile work environment claim. Def.'s Mem. Points and Auth. Supp. Mot. Summ. J. at 6–9,

ECF No. 8; *see also* Pl.'s Mem. Opp'n Def.'s Mot. Summ. J.; *Howard v. Locke*, 729 F. Supp. 2d 85, 87 (D.D.C. 2010) ("It is well understood in this Circuit that when a plaintiff files an opposition to a motion . . . addressing only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded."). But, in light of the D.C. Circuit's recent guidance, this Court will exercise care to grant summary judgment "only if the [movant's] motion and supporting materials . . . show that the movant is entitled to it." *Cohen v. Bd. of Trs.*, 819 F.3d 476, 482 (D.C. Cir. 2016) (quoting Fed. R. Civ. P. 56(e) advisory committee's note); *see also Grimes v. District of Columbia*, 794 F.3d 83, 97 (D.C. Cir. 2015) (Griffith, J., concurring) (noting that "motions for summary judgment may not be conceded for want of opposition"). Therefore, with respect to Ms. Morgan's hostile work environment claim, the Court considers if WMATA has "show[n] that there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

In its Motion for Summary Judgment, WMATA does not dispute Ms. Morgan's version of the relevant facts, which focuses on rude treatment by Ms. Stoffregen. Ms. Morgan describes two categories of behavior: first, that Ms. Stoffregen was generally rude and aggressive in talking to her; and second, that Ms. Stoffregen on occasion publicly humiliated her and did not attend meetings. Taking these claims to be true—as we must at summary judgment—the Court considers if, in sum, Ms. Morgan's allegations meet the legal standard for a hostile work environment claim.

First, Ms. Morgan alleges that Ms. Stoffregen frequently used an aggressive tone while talking to her, frequently interrupted her, frequently used hostile body language such as pointing at her, and frequently yelled at her. *See* Morgan Decl. ¶ 16 ("There was rarely a discreet discussion with a professional tone used by Ms. Stoffregen when speaking with me."); Morgan

Dep. 38:12–16 ("[M]ost of [Ms. Stoffregen's] discussions with me were very sharp in tone, she would never let me finish a statement, she talked over me, she would point at me, she would talk very loudly to me, she would point at the table as she spoke with me . . ."); Morgan Dep. 43:20–21 ("[Ms. Stoffregen] was extremely belligerent and nasty with me . . ."). In determining whether this harassment was so "severe or pervasive" as to "alter the conditions of [Ms. Morgan's] employment," *Faragher*, 524 U.S. at 786 (1998), the Court considers its frequency, severity, and effect on Ms. Morgan's work performance, *Harris*, 510 U.S. at 23 (1993). Although frequent, Ms. Stoffregen's hostility did not include physical threats, nor does Ms. Morgan claim that her work performance was affected. This is more akin to "mere offensive utterance[s]," *id.*, which courts have found to be insufficiently severe to support a hostile work environment claim. *See McCaskill v. Gallaudet Univ.*, 36 F. Supp. 3d 145, 155 (D.D.C. 2014) (holding that repeated "verbal abuse, condescension, and castigation" at regular meetings did not constitute severe or pervasive harassment); *Richard v. Bell Atl. Corp.*, 209 F. Supp. 2d 23, 35 (D.D.C. 2002) (finding that "rude comments, unjust criticism, and stressful working conditions, amount to ordinary tribulations of the workplace" rather than actionable harassment (internal quotation marks omitted)). Indeed, the D.C. Circuit has clearly instructed that a hostile work environment is not established by "occasional name-calling, rude emails, lost tempers and workplace disagreements." *Baird v. Gotbaum*, 792 F.3d 166, 171 (D.C. Cir. 2015); *see also Brooks v. Grundmann*, 748 F.3d 1273, 1277–78 (D.C. Cir. 2014) (holding that the "ordinary tribulations of the workplace, [i.e.,] a series of petty insults, vindictive behavior, and angry recriminations . . . are not actionable under Title VII" (internal quotation marks and citation omitted)). Although this allegedly rude behavior may have occurred frequently, Ms. Morgan's claims of a raised

voice, a sharp tone, and aggressive body language do not rise beyond the level of the ordinary tribulations of the workforce.

Outside of Ms. Stoffregen's generally unpleasant manner, Ms. Morgan alleges several specific incidents of mistreatment. During one telephone call Ms. Morgan claims that Ms. Stoffregen called her a liar and yelled so loudly that others could overhear. Morgan Decl. ¶ 29. In a similar vein, Ms. Morgan claims that she was subjected to "public[] ridicule[]" and "humilat[ion]" on an occasion when Ms. Stoffregen criticized her loudly with the door open. Morgan Decl. ¶ 16. Finally, Ms. Morgan asserts that Ms. Stoffregen once scheduled a meeting to help Ms. Morgan complete essential tasks, but then did not show up. Morgan Decl.¶ 23. Although mistreatment that is "humiliating" may be more severe than similar conduct that occurs in private, *Harris*, 510 U.S. at 23, this treatment was not frequent and did not affect Ms. Morgan's work performance. These acts appear to have been rare occurrences—Ms. Morgan describes only two situations where coworkers may have overheard and one meeting that Ms. Stoffregen did not attend. Ms. Morgan does not claim that any of these events "interfere[d] with [her] work performance," *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008), in fact, Ms. Morgan asserts that, despite Ms. Stoffregen's absence from the meeting, she was able to complete her work on the invoices within the deadline. Pl.'s Mat. Facts at 18. Although Ms. Morgan claims that her coworkers may have overheard Ms. Stoffregen's comments, she offers no evidence that other employees did in fact hear anything, were present, or reacted in any way to such incidents. Ms. Stoffregen's comments, although allegedly rude, did not involve any language more offensive than "liar" or physical threats. These isolated events are well below the threshold for a hostile work environment. *See, e.g.*, *Holmes-Martin v. Sebelius*, 693 F. Supp. 2d 141, 165 (D.D.C. 2010) (holding that an employee's claims that she was regularly excluded from

meetings, required to communicate with her supervisor only through email, and criticized in front of other employees did not establish a hostile work environment). And contrary to the allegations made by the plaintiff in *Holmes-Martin*, Ms. Morgan was never excluded from meetings or asked not to talk to her supervisor, and the alleged hostile acts occurred less frequently.

For these reasons, the Court concludes that the harassment Ms. Morgan describes is not sufficiently severe or pervasive to create a hostile work environment, and is not actionable under Title VII. Because the allegations in the record do not rise to the level of a hostile work environment, the Court grants WMATA's motion for summary judgment as to Ms. Morgan's claims of a hostile work environment based on her race.[11]

### B. Termination

Ms. Morgan claims that her termination was motivated by racial discrimination, and that WMATA's performance-related explanation is merely a pretext. WMATA argues that it is entitled to summary judgment because Ms. Morgan can neither rebut its non-discriminatory reason nor show that the actual reason for her termination was discrimination. Finding both of WMATA's arguments unavailing, the Court denies WMATA summary judgment as to Ms. Morgan's discriminatory termination claim. Ms. Morgan sufficiently rebuts WMATA's performance-based reasons and her rebuttal suffices to establish an inference of discrimination here.

In this circuit, the *Brady* test controls summary judgment when it is clear that the plaintiff suffered an "adverse employment action" and her employer asserts a "legitimate, non-discriminatory reason" for that action. *See Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008). *Brady* governs this case because Ms. Morgan was involuntarily terminated, which is

---

[11] Because the Court finds that the events in question did not create a hostile work environment, the Court does not consider whether Ms. Morgan could adequately connect the motivation for her alleged harassment to her race.

clearly an adverse employment action, and WMATA asserts in its Termination Memorandum and briefing that Ms. Morgan was fired for the non-discriminatory reason of poor performance.

*Brady* identifies one "central question" in such cases at summary judgment: "Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race"? *Id.* To answer this question, the Court considers "whether a reasonable jury could infer discrimination . . . from 'all the evidence, which includes not only the prima facie case but also the evidence the plaintiff offers to attack the employer's proffered explanation for its actions and [any] other evidence.'" *Morris v. McCarthy*, 825 F.3d 658, 668 (D.C. Cir. 2016) (quoting *Gaujacq v. EDF, Inc.*, 601 F.3d 565, 577 (D.C. Cir. 2010) (alteration in *Morris*)). Such an inference of discrimination may arise based on "a factfinder's disbelief of the reasons put forward by the defendant," even if the plaintiff does not present direct evidence that the employer was motivated by discrimination. *Hamilton v. Geithner*, 666 F.3d 1344, 1351 (D.C. Cir. 2012) (internal quotation marks omitted, quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)). Because of this inference, courts "do not routinely require plaintiffs to submit evidence over and above rebutting the employer's stated explanation in order to avoid summary judgment." *Id.* at 1351 (internal quotation marks omitted, quoting *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1290 (D.C. Cir. 1998)); *cf. Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147–48 (2000).

The Court first considers whether Ms. Morgan has rebutted WMATA's claim that she was discharged for the non-discriminatory reason of poor performance, as exemplified by the issues summarized in the Termination Memorandum. In this circuit, "[t]here are multiple ways in which circumstantial evidence may support an inference that an employer's stated reason . . . was

not the actual reason." *Allen v. Johnson*, 795 F.3d 34, 40 (D.C. Cir. 2015). These avenues include "pointing to evidence that the employer treated other, similarly situated employees better; that the employer is lying about the underlying facts of its decision; . . . . [or] an error too obvious to be unintentional." *Id.* (internal quotation marks and citations omitted).

Rebuttal through comparator evidence, or evidence that "similarly situated persons of a different race [] received more favorable treatment," is likely not available to Ms. Morgan because there are likely no similarly situated employees.[12] *Brady*, 520 F.3d at 495. Thus, the Court turns to evidence that "the employer is making up or lying about the underlying facts that formed the predicate for the employment decision." *Id.* at 495. The standard is "whether the employer honestly believes in the reasons it offers" not "the correctness or desirability" of those reasons. *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (internal quotation marks and citations omitted). Thus, a jury could not find that an employer's decision was pretextual if the "employer's stated belief about the underlying facts is reasonable in light of

---

[12] Ms. Morgan obliquely suggests that Mr. Lott was a similarly situated employee, and that Ms. Stoffregen's treated Ms. Morgan and Mr. Lott very differently after the instructor incident. Pl.'s Mem. Opp'n Def.'s Mot. Summ. J. at 15–17, ECF No. 11. A similarly situated employee must be "nearly identical" in "all of the relevant aspects" of employment. *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1115–16 (D.C. Cir. 2016) (quoting *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015)). This includes the "jobs and job duties [and] whether they were disciplined by the same supervisor." *Burley*, 801 F.3d at 301. Here, although Mr. Lott and Ms. Morgan were both supervised by Ms. Stoffregen and both delayed telling her about problems with the instructor, they did not have the same job duties. Ms. Stoffregen was a grant manager while Mr. Lott managed a team of instructors. Stoffregen Dep. at 104. More importantly, Ms. Morgan was still on probation while Mr. Lott was a long-standing employee. *See McKenna v. Weinberger*, 729 F.2d 783, 789–90 (D.C. Cir. 1984) (upholding a district court's finding of fact that a probationary and permanent employee were not similarly situated). Indeed, because Ms. Morgan was the only person managing the grant it would be difficult for her identify comparators in this case. *Cf. Vatel v. All. of Auto. Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011) ("The nature of [the plaintiff's] position [as a lone assistant] means, moreover, that many of the methods that employment discrimination plaintiffs ordinarily use to demonstrate pretext are not available . . .").

the evidence." *Brady*, 520 F.3d at 495. Similarly, "[o]nly the perception of the decisionmaker matters; plaintiff's perception of his [or her] own work performance is not relevant." *Khan v. Holder*, 37 F. Supp. 3d 213, 227 (D.D.C. 2014) (internal quotation marks and citations omitted). The Court addresses each of the six issues that WMATA claims demonstrate Ms. Morgan's poor performance and justify her termination.

### 1.   Allowing Training to Begin Prior to Completion of the MOUs

Ms. Morgan has raised a genuine issue of material fact as to whether she reasonably merited discipline for "allow[ing]" the VETS Group to start training without a signed MOU. *See supra* at II.B.1. First, Ms. Morgan points out that Ms. Stoffregen praised her work on the MOUs immediately after they were executed—and after Ms. Stoffregen realized the VETS Group had started training. *See* Email from Linda Stoffregen to Cecily Morgan and Sonia Bacchus (Sept. 19, 2013), ECF No. 11-9 ("Thank you for your unwavering dedication in getting these MOUs completed and signed . . . I know you will do well managing this program based upon the outstanding job you did with the constant monitoring and management of the MOUs."). These statements are evidence of "the perception of the decisionmaker," and suggest that Ms. Stoffregen did not view the timing of the MOU as a major problem. A jury could well decide that these contemporaneous statements represent Ms. Stoffregen's actual views and that her later justifications for firing Ms. Morgan were after-the-fact rationalizations. *George v. Leavitt*, 407 F.3d 405, 413–15 (D.C. Cir. 2005) (holding that a jury could have found the employer's proffered explanation "not worthy of credence" when it was contradicted by contemporaneous evidence from coworkers); *White v. Johnson*, 172 F. Supp. 3d 178, 185–86 (D.D.C. 2016) (finding that "[a] reasonable jury could . . . conclude that [the employer's] proffered explanations are no more than *post hoc* justifications" when the employer's explanation was contradicted by

contemporaneous performance evaluations from coworkers). In addition, Ms. Morgan argues

that she was never given a specific deadline for the MOUs, Morgan Dep. at 51:7–9, and thus her

completion of them could not have constituted poor performance.

Furthermore, Ms. Morgan asserts that Ms. Stoffregen had been warned about the MOU

delays in mid-August and specifically instructed Ms. Morgan to keep the planned start date.

Morgan Decl. ¶ 16. Accepting these facts as true, a reasonable jury could conclude that in

allowing the VETS training to begin before the MOU was executed (rather than delaying the

start date) Ms. Morgan was simply following instructions from her supervisor, Ms. Stoffregen.

Because Ms. Stoffregen herself gave Ms. Morgan the alleged directive, a reasonable jury could

find that Ms. Stoffregen did not reasonably believe that Ms. Morgan performed poorly by

allowing the training to start as planned.

### 2.  Not Personally Notifying Ms. Stoffregen of Problems with an Instructor

Ms. Morgan has also raised a fact issue for the jury as to whether Ms. Stoffregen could

reasonably have blamed her for letting Mr. Lott deliver the bad news about the instructor he

hired. As discussed *supra* at II.B.2, both WMATA and Ms. Stoffregen agree that Ms. Morgan

had no responsibility for selecting the instructors. As this circuit held in *Czekalski v. Peters*, an

employer's non-discriminatory reason does not suffice if it blames the plaintiff for a problem

outside of his or her area of responsibility. *See* 475 F.3d 369, 367 (D.C. Cir. 2007). Furthermore,

WMATA does not dispute that Mr. Lott did, in fact, promise to inform Ms. Stoffregen. While

Ms. Stoffregen nonetheless flatly claims that she found it more sensible to blame Ms. Morgan, a

jury could certainly find that her explanation is not credible in light of the evidence that Mr. Lott

and Ms. Morgan were both managers and that Mr. Lott had full responsibility for the instructors.

"[W]eaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the

employer's proffered legitimate reasons for its action" may serve as persuasive rebuttals.

*Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (quoting, among others *Fuentes v.*

*Perskie*, 32 F.3d 759, 765 (3d Cir.1994)).

### 3.  Failure to Effectively Manage the Grant and Achieve Results

Turning to Ms. Morgan's alleged poor general performance in managing the grant, the

Court concludes that Ms. Morgan has sufficiently shown a genuine issue of material fact. As

discussed *supra* at II.B.3, WMATA does not provide any specific examples of Ms. Morgan's

deficiencies. Without any missed deadlines, poor performance reports, or specific examples of

failures by Ms. Morgan, a jury could decide not to credit Ms. Stoffregen's after-the-fact

assertions of dissatisfaction. Although WMATA identifies emails from Ms. Stoffregen providing

deadlines and assignments to Ms. Morgan, a jury could believe Ms. Morgan's explanation that

the emails do not demonstrate poor performance because Ms. Morgan promptly fulfilled all of

the resulting assignments and had not previously missed deadlines or otherwise created the need

for additional supervision.

### 4.  and 5.  Lack of Guidance and Problems Reviewing Invoices

There is also a genuine issue of material fact as to whether Ms. Morgan failed to assist

participants and validate invoices. As discussed *supra* at II.B.4–5, WMATA does not elaborate

on the supposed lack of guidance, and Ms. Morgan's evidence shows that she provided

significant help through a variety of means to the VETS Group. While WMATA identifies flaws

in the invoices, Ms. Morgan responds that she did catch the errors and reported them to Ms.

Stoffregen. WMATA does not present evidence of any missed deadlines for processing the

invoices. Although the process was prolonged, there are issues of fact as to whether Ms. Morgan

or the VETS Group was the cause.

### 6.  Lack of Proficiency in Budgeting

Finally, a jury could conclude that it was unreasonable for WMATA to believe that Ms.

Morgan lacked budgeting expertise. Although Ms. Stoffregen created her own Excel spreadsheet,

Ms. Morgan states that Ms. Stoffregen had previously accepted the use of Ms. Morgan's version

for several months without complaint. As discussed *supra* at II.B.6, WMATA does not offer any

specific deficiencies with Ms. Morgan's version. If a jury accepted Ms. Morgan's view of the

facts, it might reject WMATA's explanation, especially if it concluded that, as Ms. Morgan

asserts, the two budget documents were functionally identical.

*          *          *

The Court thus concludes that the "evidence [Ms. Morgan offers] to attack the

employer's proffered explanation for its actions," *Aka*, 156 F.3d at 1289, rebuts each of

WMATA's six examples of her poor performance. Ms. Morgan has thus established a genuine

issue of material fact as to whether poor performance was the actual reason for her firing.[13] In

many cases, such a rebuttal suffices to raise an inference of discrimination and allow the plaintiff

---

[13] When an employer asserts multiple reasons for a termination, it is not clear how many reasons the plaintiff must successfully rebut to avoid summary judgment. *Compare Davis v. George Wash. Univ.*, 26 F. Supp. 3d 103, 119 (D.D.C. 2014) (holding that the plaintiff must raise an issue of fact as to each reason when an employer proffers multiple non-discriminatory reasons (citing *Wolf v. Buss (Am.) Inc.*, 77 F.3d 914, 920 (7th Cir. 1996)), *with Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1126 (10th Cir. 2005) ("However, we recognize that when the plaintiff casts substantial doubt on many of the employer's multiple reasons, the jury could reasonably find the employer lacks credibility.") (internal quotation marks and citations omitted), *and Fuentes v. Perskie*, 32 F.3d 759, 764 n.7 (3d Cir. 1994). In this case, WMATA's argument appears to be that Ms. Morgan was terminated for poor performance, as exemplified through the six issues listed in the Termination Memorandum. Of these six issues, Ms. Stoffregen suggests that the first—that the VETS Group began training without an MOU—was the most important. *See* Stoffregen Dep at 53:21–54:3 ("[I]n the termination letter . . . the straw that broke the camel's back was that Ms. Morgan allowed the training to commence prior to the MOU being signed."). Because the Court concludes in this case that all six issues have been rebutted, it concludes that Ms. Morgan has rebutted WMATA's evidence for poor performance and does not consider how many sub-areas would suffice.

to proceed to trial. *See Morris*, 825 F.3d at 668. Although Title VII plaintiffs may use their prima facie case to bolster claims of discrimination, here the fact that Ms. Morgan satisfies the elements of a prima facie case adds little to the analysis.[14] And while the Court also considers "any further evidence of discrimination that may be available to the plaintiff . . . or any contrary evidence that may be available to the employer," *Aka*, 156 F.3d at 1289, in this case Ms. Morgan does not offer any additional evidence showing that her termination was motivated by discrimination[15] and WMATA does not demonstrate that it has a strong record of equal opportunity employment. The Court thus turns to the question of whether an inference of discrimination is appropriate based simply on Ms. Morgan's showing of pretext.

Such an inference of discrimination is often available when a plaintiff rebuts the employer's stated non-discriminatory reason because

---

[14] The elements of a prima facie case for employment discrimination resulting in termination are "(1) [the plaintiff] is a member of a protected class; (2) [the plaintiff] suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." *Vickers v. Powell*, 493 F.3d 186, 194 (D.C. Cir. 2007) (citations omitted). Here, Ms. Morgan satisfies the first two elements of the prima facie case as she is a member of a protected class, and termination is an adverse employment action. And, in the context of this case, the question of whether Ms. Morgan has rebutted WMATA's non-discriminatory reason merges with the overall question of whether an inference of discrimination arises.

[15] No direct evidence appears in the record, apart from Ms. Morgan's statements that other coworkers warned her of discrimination by Ms. Stoffregen. *See, e.g.*, Morgan Dep. at 41:15–18 (relating statements by Ms. Beachum and other African American employees about Ms. Stoffregen). Although testimony by coworkers about discrimination may be useful, "unsubstantiated co-worker testimony alone is generally insufficient to raise a question of material fact regarding pretext at the summary judgment stage." *Johnson v. Perez*, 66 F. Supp. 3d 30, 42 (D.D.C. 2014), *aff'd*, No. 15-5034, 2015 WL 5210265 (D.C. Cir. July 1, 2015). Here, the greater problem is that Ms. Morgan's statements about other employees' comments are likely inadmissible hearsay. "While a nonmovant is not required to produce evidence in a form that would be admissible at trial, the evidence still must be capable of being converted into admissible evidence." *Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000) (citing Fed. R. Civ. P 56(e) (finding nonmovant's accounts of third-party conversations could not oppose summary judgment). Ms. Morgan does not provide declarations from these employees and has not attempted to explain how these statements would be admissible.

> proof that the defendant's explanation is unworthy of credence is simply one form
> of circumstantial evidence that is probative of intentional discrimination, and it
> may be quite persuasive . . . . Moreover, once the employer's justification has
> been eliminated, discrimination may well be the most likely alternative
> explanation, especially since the employer is in the best position to put forth the
> actual reason for its decision.

*Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 147–48 (2000); *see also id.* ("[A]

plaintiff's prima facie case, combined with sufficient evidence to find that the employer's

asserted justification is false, may permit the trier of fact to conclude that the employer

unlawfully discriminated."). In the words of the D.C. Circuit, "[b]ecause in appropriate cases a

'factfinder's disbelief of the reasons put forward by the defendant' may support an inference of

intentional discrimination, we do not routinely require plaintiffs 'to submit evidence over and

above rebutting the employer's stated explanation in order to avoid summary judgment.'"

*Hamilton*, 666 F.3d at 1351 (first quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511

(1993), then quoting *Aka*, 156 F.3d at 1290). And that seems appropriate here.

　　　But, the D.C. Circuit has identified two situations in which such as inference is *not*

appropriate, either when the plaintiff's argument "conclusively demonstrates that the real

explanation for the employer's behavior is not discrimination, but some other motivation" or

when "the plaintiff has created only a weak issue of material fact as to whether the employer's

explanation is untrue and there is abundant independent evidence in the record that no

discrimination has occurred." *Murray v. Gilmore*, 406 F.3d 708, 714–15 (D.C. Cir. 2005)

(quoting *Aka*, 156 F.3d at 1291). Neither exception applies here. Ms. Morgan's evidence does

not suggest a motivation other than discrimination, nor is there "abundant independent evidence

in the record that no discrimination has occurred." As neither exception applies here, the Court

will not "require [Ms. Morgan] to submit evidence over and above rebutting the employer's

stated explanation in order to avoid summary judgment." *Hamilton*, 666 F.3d at 1351 (internal

quotation marks and citations omitted).

This conclusion is appropriate because there are genuine issues of material fact for the

jury to consider. Ms. Morgan has rebutted WMATA's explanation of poor performance by

addressing each of the six alleged examples of poor performance. Based upon Ms. Stoffregen's

asserted acquiescence in beginning training without an MOU and her contemporaneous praise

for Ms. Morgan's work on the MOUs; Mr. Lott's responsibility for managing instructors and his

promise to inform Ms. Stoffregen of the problem; the lack of evidence indicating that Ms.

Morgan mismanaged the grants, failed to give the grantees appropriate guidance or failed to

identify errors in the submitted invoices; and the similarity between Ms. Morgan and Ms.

Stoffregen's budgets; a jury might conclude that WMATA "is making up or lying about the

underlying facts that formed the predicate for the employment decision" and thus that its asserted

explanation is a pretext for discrimination. *Brady*, 520 F.3d at 495. Thus, especially in light of

the "caution" to be applied in granting employers summary judgment in discrimination cases,

*Woodruff v. Peters*, 482 F.3d 521, 526 (D.C. Cir. 2007), the Court denies summary judgment to

WMATA on Ms. Morgan's claim of discriminatory termination. *See, e.g.*, *Kalinoski v. Gutierrez*,

435 F. Supp. 2d 55, 69 (D.D.C. 2006) (denying an employer summary judgment even though

plaintiff's showing of discrimination was "based entirely upon evidence that either tends to

negate defendant's explanation or (in some cases) tends to rule out other possible gender-neutral

explanations for the reassignment" and noting that although "[t]he inference of sex-based bias is

therefore not a strong one . . . . under the applicable precedent in this Circuit, it is nonetheless a proper issue for jury resolution").[16]

## V.  CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (ECF No. 8) is **GRANTED IN PART** and **DENIED IN PART**. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: November 18, 2016                                    RUDOLPH CONTRERAS
                                                            United States District Judge

---

[16] WMATA adds in its reply a brief argument that the "same actor inference" should weigh here against discrimination. Def.'s Reply to Pl.'s Opp'n Def.'s Mot. Summ. J. at 3, ECF No. 13. The D.C. Circuit has recognized the same actor inference where "the person who made the decision to fire [the plaintiff] was the same person who made the decision to hire" because "'it is difficult to impute to [that person] an invidious motivation' . . . especially 'when the firing has occurred only a short time after the hiring.'" *Vatel v. All. of Auto. Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011) (quoting *Waterhouse v. District of Columbia*, 298 F.3d 989, 996 (D.C. Cir. 2002) (alteration in original)). Here, Ms. Stoffregen did hire Ms. Morgan for the job, and then terminated her just a few months later. Because WMATA did not raise the issue of same actor inference until its reply brief, Def.'s Reply at 3, ECF No. 13, the court may deem the argument waived, *Jones v. Mukasey*, 565 F.Supp.2d 68, 81 (D.D.C. 2008). Moreover, the same actor inference is "just that, an inference, which cannot immunize [the defendant] from liability for subsequent discrimination." *Ragsdale v. Holder*, 668 F. Supp. 2d 7, 23 (D.D.C. 2009) (alteration in original) (internal quotation marks omitted). When none of the six elements WMATA cites for Ms. Morgan's poor performance has been established beyond material dispute, even applying this inference would not merit granting summary judgment in favor of WMATA.